UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| | CASE NO. 2:24-cv-09151-JLS-AGR |
| BRENDAN POTYONDY,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC COAST ENERGY COMPANY, LP,<br><br><br>Defendant. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DOC. 51)** |

1

Before the Court is a Motion for Summary Judgment filed by Defendant Pacific Coast Energy Company, LP.  (Mot., Doc. 51; Mem., Doc. 54.)  Plaintiff Brendan Potyondy opposed, and Defendant replied.  (Opp., Doc. 56; Reply, Doc. 62.)  The Court held a hearing on this matter on April 17, 2026.  For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.

## I.      **BACKGROUND**

Defendant Pacific Coast Energy Company, LP is an energy company that owns and operates oil and gas resources, including wells, in California.  (Reply to Statement of Disputed Facts, "Statement of Facts" ¶ 1, Doc. 62-1.)  Pacific Coast Oil Trust ("PCOT") is a trust formed by Defendant, which holds the net profits and royalty interests in Defendant's oil and gas properties.  (*Id.* ¶ 2.)  PCOT is listed on the New York Stock Exchange and holds its assets for the benefit of its unitholders.  (*Id.*)  Defendant is required to convey the profits derived from Defendant's resources to PCOT.  (Hasbo Decl. ¶ 6, Doc. 51-4.)

Plaintiff Brendan Potyondy worked as a Production Engineer for Defendant from February 22, 2022 until January 19, 2024.  (Statement of Facts ¶¶ 3, 20.)  Plaintiff's job responsibilities included, among other things, preparing technical reservoir engineering reports and assisting in the creation of reserve reports.  (*Id.* ¶ 4.)  Reserve reports are reports prepared by oil companies which estimate the future net income from the oil and gas assets in a well.  (*Id.* ¶ 8.)  The reports involve classifying resources into proved, probable, and possible reserves based on geological data and future regulatory impediments.  (*Id.*)  The classification of reserves can have a significant impact on an oil company's value.  (Ex. C to Bean Decl., Hasbo Depo. at 12, Doc. 59-3.)

Defendant prepares internal reserve reports.  (Hasbo Decl. ¶ 17.)  Additionally, Netherland, Sewell, & Associates, Inc. ("NSAI") prepares Defendant's annual audited reserve reports, which are based in part on Defendant's internal reserve reports.  (*Id.* ¶¶ 11, 17.)  NSAI shares its reserve reports with PCOT.  (*Id.* ¶¶ 11, 17.)

2

In March 2023, Plaintiff and his coworker, Don LeBlanc, emailed Klaus Hasbo, Defendant's Chief Executive Officer ("CEO"), proposing certain classifications for resources and reserves.  (Ex. A to Potyondy Decl., March 2023 Email, Doc. 61-1.) Plaintiff stated that his proposed classifications were preferable to alternative classifications, which could cause "NSAI, Banks, and others" to be "confused."  (*Id.* at 3.) Plaintiff forwarded the email chain to Philip Brown, Defendant's Chief Operating Officer ("COO").  (*Id.* at 2.)  Plaintiff told Brown that "Klaus [Hasbo] was asking for [certain classifications that] conflicted with typical Reserves terminology."  (*Id.*)  In a July 2023 meeting, Plaintiff reminded Hasbo of the email chain, telling Hasbo in the meeting that Defendant "was misclassifying resources as reserves," which was incorrect because "those should be contingent resources."  (Ex. G to Bean Decl., Potyondy Depo. at 94, 117, Doc. 59-7.)

In June 2023, Plaintiff raised another concern with Lisa Toler, who was Defendant's Controller and Chief Financial Officer ("CFO") at the time.  (*Id.* at 4–5; Potyondy Decl. ¶ 20, Doc. 61.)  Plaintiff told Toler that Patrick Glenn, one of Defendant's employees, had "falsified well counts intentionally."  (Potyondy Depo. at 5.)  Defendant's well counts are an important metric in Defendant's financial reporting to PCOT.  (Ex. E to Bean Decl., Dale Depo. at 4, Doc. 59-5.)  Plaintiff told Toler that he would not provide the inaccurate well counts to PCOT's auditor.  (Potyondy Depo. at 7.)  Plaintiff further told Toler that the information given to PCOT's auditor in the past had been inaccurate.  (*Id.* at 30.)

Plaintiff also assisted with Defendant's asset retirement obligations ("AROs"). (Statement of Facts ¶ 10.)  AROs are the legal obligations of an oil and gas company to plug and abandon wells after their useful life, which can cost hundreds of thousands of dollars per well.  (*Id.* ¶ 5.)  Defendant's AROs are one of its key costs.  (*Id.*)  ARO costs must be estimated before they are incurred.  (*Id.*)  The ARO costs are important metrics in Defendant's financial reporting that it shares with PCOT.  (Dale Depo. at 4.)

3

Since 2019, Defendant has engaged the accounting firm Moss Adams LLP ("Moss Adams") to calculate and analyze Defendant's future ARO costs.  (Statement of Facts ¶ 7.)  Plaintiff provided certain ARO information to Moss Adams.  (Potyondy Depo. at 38.)  However, in August 2023, Plaintiff learned that one of Defendant's resources would take 20 years to abandon.  (*Id.* at 39.)  By contrast, the schedule Defendant provided to Moss Adams showed that it would take 5 or 6 years to abandon the resource.  (*Id.*)  Plaintiff believed that compressing ARO costs into 5 or 6 years was "more punitive to PCOT," and reported the discrepancy to Patrick Glenn, Defendant's Vice President of Operations, who reported it to Hasbo, Defendant's CEO.  (*Id.* at 39–40.)  Hasbo and Glenn verbally told Plaintiff to "keep as is."  (*Id.* at 39.)  Plaintiff asserts that petroleum engineers like himself, Hasbo, and Glenn would understand that compressing an abandonment schedule in this way is "deceiving the auditor" and "deceiving unsophisticated investors."  (*Id.* at 40.)

In October and November 2023, Plaintiff continued to raise issues with Defendant's management.  For example, in October 2023, Plaintiff informed management about an issue with a "2021 oil differential calculation."  (*Id.* at 3.)  In November 2023, Plaintiff emailed Vice President of Operations Glenn regarding field classifications in ARO calculations.  (*See* Glenn Decl. ¶ 11, Doc. 51-5; Potyondy Depo. at 36.)

On December 13, 2023, Plaintiff met with Philip Brown, Defendant's COO, who told Plaintiff that he was being terminated.  (Brown Decl. ¶ 5, Doc. 51-3.)  Brown avers that Plaintiff was terminated because Defendant "made the business decision to rely more heavily on third-party consultants and independent contractors for the kind of work [Plaintiff] did[.]"  (*Id.* ¶ 4.)  Thus, Defendant was "eliminating [Plaintiff's] position[.]"  (*Id.* ¶ 5.)  No other employees aside from Plaintiff were terminated at this time.  (Statement of Facts ¶ 39.)

Plaintiff's last day of employment was January 19, 2024; until then, he remained employed with Defendant and maintained access to Defendant's resources.  (Brown Decl. ¶ 5.)

On October 23, 2024, Plaintiff filed this action against Defendant.  (Compl., Doc. 1.)  Plaintiff brings one claim for retaliation in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A.  (SAC, Doc. 27.)  Plaintiff alleges that he internally reported multiple instances of conduct which he reasonably believed constituted fraud against shareholders, and that such reports contributed to his termination.  (*See id.*)  Defendant filed a motion to dismiss in February 2025, which the Court denied in its entirety.  (Doc. 37.)

Defendant now moves for summary judgment, or in the alternative, summary adjudication.  (Mot.)  Defendant contends that Plaintiff's claim for retaliation under Sarbanes-Oxley fails as a matter of law, and that Plaintiff's prayer for punitive damages fails as a matter of law.

## II.   **LEGAL STANDARD**

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is proper "if the [moving party] shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-moving party's favor, and a fact is "material" when it might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.  But "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 828 (9th Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted)).

The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried.  The moving party bears the initial burden of demonstrating the absence of a genuine dispute of fact.  *Celotex Corp. v. Catrett*, 477 U.S.

5

317, 323 (1986). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

III.    **ANALYSIS**

Sarbanes-Oxley's whistleblower provision, 18 U.S.C. § 1514A, "protects employees of publicly-traded companies from discrimination in the terms and conditions of their employment when they take certain actions to report conduct that they reasonably believe constitutes certain types of fraud or securities violations." *Tides v. Boeing Co.*, 644 F.3d 809, 813 (9th Cir. 2011). Whistleblower claims under Sarbanes-Oxley "are governed by a burden-shifting procedure under which the plaintiff is first required to establish a prima facie case of retaliatory discrimination." *Id.* at 813–14. To make a prima facie showing, a plaintiff must establish that "(1) he engaged in protected activity or conduct; (2) his employer knew or suspected, actively or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the circumstances were sufficient to raise an inference that the protected activity was a contributing factor in the unfavorable action." *Id.* at 814; *see also* 29 C.F.R. § 1980.104(e)(2)(i)–(iv). After a plaintiff has established the prima facie case, "the employer assumes the burden of demonstrating by clear and convincing evidence that it would have taken the same adverse employment action in the absence of the plaintiff's protected activity." *Tides*, 644 F.3d at 814 (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009)).

Defendant argues that Plaintiff's prima facie case fails as a matter of law because (1) Plaintiff did not engage in protected activity; (2) Defendant had no actual or constructive knowledge that Plaintiff engaged in protected activity; and (3) the protected activity was not a contributing factor in Plaintiff's termination. Defendant further argues

6

that even if there exists a factual dispute with respect to Plaintiff's prima facie case, Defendant has demonstrated that it would have terminated Plaintiff even in the absence of protected activity.  Finally, Defendant argues that Plaintiff's claim for punitive damages fails as a matter of law.  The Court addresses each of these arguments in turn.

### A.    Prima Facie Case

#### 1.    Protected Activity

An employee engages in protected activity if he "provide[s] information . . . regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities or commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders[.]"  18 U.S.C. § 1514A(a)(1).  Importantly, the employee need not show that the employer actually violated a listed law.  *Van Asdale*, 577 F.3d at 1001.  Rather, "[t]o encourage disclosure, Congress chose statutory language which ensures that 'an employee's reasonable but mistaken belief that an employer engaged in conduct that constituted a violation of one of the six enumerated categories is protected.'"  *Id.* (quoting *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 477 (5th Cir. 2008)).  Accordingly, the employee must possess only the "subjective belief that the conduct being reported violated a listed law," and the "belief must be objectively reasonable."  *See Rocheleau v. Microsemi Corp., Inc.*, 680 F. App'x 533, 535 (9th Cir. 2017); *Van Asdale*, 577 F.3d at 1001.  Whether an employee's belief is objectively reasonable "is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee."  *Wadler v. Bio-Rad Lab'ys, Inc.*, 916 F.3d 1176, 1188 (9th Cir. 2019) (quoting *Sylvester v. Parexel Int'l LLC*, 2011 WL 2517148, at *12 (Dep't of Labor May 25, 2011) (en banc)).

Plaintiff contends that in three instances, there exists a factual dispute as to whether he reasonably believed he was reporting securities fraud: (1) when Plaintiff told Controller

and CFO Lisa Toler that well counts were falsified, (2) when Plaintiff told CEO Klaus Hasbo and COO Philip Brown that reserves were misclassified, and (3) when Plaintiff told CEO Hasbo and Vice President of Operations Patrick Glenn that ARO information was misreported.[1]

There exists at least a factual dispute as to whether it was reasonable to believe that the conduct reported by Plaintiff constituted securities fraud.  First, in June 2023, Plaintiff reported that Defendant was falsifying well counts.  To show that a reasonable employee would believe that such conduct could constitute a material misrepresentation to PCOT's unitholders, Plaintiff submits evidence showing that well counts are "an important metric in the financial reporting" from Defendant to PCOT, and that inaccurate well counts can result in inaccurate financial reporting.  (Dale Depo. at 4; Ex. F to Bean Decl., Toler Depo. at 11, Doc. 59-6.)  In response, Defendant submits a declaration from its Vice President of Operations Patrick Glenn, who describes in detail the reason for the well count discrepancy, and avers that "the well count issue that [Plaintiff] was confused about could have no discernible impact on reserves reporting, ARO estimates, or anything else." (Glenn Decl. ¶¶ 13–16.)  But even if the specific well count issue Plaintiff identified ultimately did not have an impact on financial reporting, the relevant question is whether a

---

[1] Defendant argues that to "hold a reasonable belief that the actions [he] reported constituted shareholder fraud, [an employee] needed to believe that they approximated the elements of securities fraud: 'material misrepresentation or omission, scienter, a connection with the purchase or sale of a security, reliance, economic loss, and loss causation.'" *Rocheleau*, 680 F. App'x at 536.  The ARB in *Platone v. FLYi, Inc.* required a whistleblower to "'approximate . . . the basic elements' of the kind of fraud or violation alleged." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 806 (6th Cir. 2015) (quoting *Platone*, 2006 WL 3193772, at *9, 12 (U.S. Dep't of Labor Sept. 29, 2006)).  However, in 2011, the ARB in *Sylvester v. Parexel Int'l LLC* abrogated the standard set forth in *Platone*, and held that "a complainant can have an objectively reasonable belief of violation of the laws . . . even if the complainant fails to allege, prove, or approximate specific elements of fraud." 2011 WL 2165854, at *14–15.  And although the Ninth Circuit in *Rocheleau*, an unpublished case, still required the plaintiff's theory of misconduct to "approximate the elements" of fraud, other Ninth Circuit cases have not adopted this language post-*Sylvester*. *See Wadler*, 916 F.3d at 1187–88.  However, even if Plaintiff is required to believe that Defendant's conduct approximated the elements of securities fraud, the Court concludes that Plaintiff has created a triable issue of fact as to that belief, for the reasons described below.

reasonable employee might believe that it could.  Plaintiff's evidence suggests that well count misrepresentations can, in general, constitute material misrepresentations to shareholders, while a reasonable jury could infer from Defendant's evidence that, if the well count issue was not fraudulent, this was only due to certain esoteric reasons.  This evidence is sufficient to create a triable issue of fact regarding the reasonableness of Plaintiff's belief that fraud was occurring.  *See Wadler*, 916 F.3d at 1188 (reasoning that "the evidence needed to support a whistleblower's reasonable belief will necessarily vary with the circumstances" and need not "directly implicate" a violation in order to support a reasonable belief of unlawful conduct).

Second, in March and July of 2023, Plaintiff reported that Defendant was "misclassifying resources as reserves," which was incorrect because "those should be contingent resources."  (Potyondy Depo. at 11.)  Plaintiff testified that such a classification was an attempt "to deceive PCOT's auditor and PCOT's investors and defraud them."  (*Id.* at 18.)  The evidence suggests that even the internal misclassification of reserves can affect a company's valuation: Defendant's officers have testified that reserve reports inform a company's value, and that the auditor, NSAI, uses internal reserve classifications to prepare its annual reserve reports which are shared with PCOT.  (Ex. D to Bean Decl., Foss Depo. at 9, Doc. 59-4; Hasbo Decl. ¶ 17.)  Defendant, however, submits a declaration from another engineer employed by Defendant, Don LeBlanc, who states that the reserves classification dispute was a "very typical discussion" that did not point to anything "improper or deceptive [that] was being done in estimating reserves."  (LeBlanc Decl. ¶ 8, Doc. 51-6.)  Like before, Defendant's evidence appears to signify a difference of opinion between engineers as to the impact the misclassifications would have on financial reporting.  A mere difference of opinion, however, falls far short of establishing, as a matter of law, the unreasonableness of Plaintiff's belief that reserves misclassifications would defraud shareholders.  Rather, Plaintiff's own testimony and that of Defendant's other employees point to the importance of reserves classifications to an oil company's

9

valuation, and is sufficient to create a factual dispute as to the reasonableness of Plaintiff's belief that shareholder fraud was occurring.

Third, in August 2023, Plaintiff told Vice President of Operations Patrick Glenn that the ARO schedule showed that certain resources would take 5 to 6 years to abandon, but that Plaintiff had learned it would take around 20 years to abandon them.[2]  (Potyondy Depo. at 39.)  Plaintiff was told to "keep as is."  (*Id.*)  Plaintiff testified that the ARO schedule was "not accurate, it's fraudulent" and that "compress[ing the schedule] into five or six years [would] be more punitive to PCOT."  (*Id.* at 40.)  Plaintiff further testified that Glenn and CEO Klaus Hasbo would know that "when they're falsifying a schedule [] they're being deceptive and they're deceiving unsophisticated investors."  (*Id.*)  Other evidence also suggests that ARO scheduling is material to investors; for example, Defendant's employees have testified that ARO information is an important metric in Defendant's financial reporting to PCOT.  (Dale Depo. at 4.)  Such evidence creates a triable issue of fact as to whether Plaintiff's belief that the ARO scheduling discrepancy was deceptive and materially impacted investors was reasonable.

Plaintiff has also submitted evidence going to his subjective belief that Defendant was violating the law in each of these three instances.  Plaintiff testified during his deposition that (1) he reported the falsified well counts "because it's fraudulent to the shareholders of PCOT," (2) he reported the reserves misclassifications which was "information that [he] reasonably believed was a violation of the law", and (3) he reported the ARO scheduling issue which was "way off . . . not accurate, it's fraudulent." (Potyondy Depo. at 5, 18, 40.)  Defendant argues that Plaintiff could not have actually

---

[2] Defendant argues that Plaintiff did not tell management "that the scheduling of AROs was a 'form of financial manipulation that deceived PCOT's auditor' . . . or that Plaintiff *objected* to how AROs were scheduled." (Reply at 13 (emphasis in original).)  However, under the plain language of the Sarbanes-Oxley Act, Plaintiff need only "provide information . . . regarding any conduct which the employee reasonably believes" violates a specified law.  18 U.S.C. § 1514A(a)(1).  Defendant points to no caselaw requiring an employee who has provided information regarding potentially illegal conduct to also explicitly raise an objection to the conduct.

believed that the conduct at issue was a violation of the law because, if he had, he would have explicitly told his supervisors that the conduct was illegal and fraudulent. (Reply at 9.) But Plaintiff provides a plausible explanation: although he told his employer that certain conduct was wrong, he did not use as strong words as "fraudulent" or "deceptive" because he "wanted to keep [his] job at PCEC at that time." (Potyondy Depo. at 8.) Based on this evidence, a reasonable jury could conclude that Plaintiff actually believed that the conduct being reported was fraudulent, even though he did not explicitly communicate that it was fraudulent. *See Van Asdale*, 577 F.3d at 1002 ("[I]n passing the Sarbanes-Oxley Act, Congress noted the existence of a 'culture, supported by law, that discourage[s] employees from reporting fraudulent behavior . . . even internally.'" (quoting S.Rep. No. 107–146, at 5 (2002))).[3]

Accordingly, the Court concludes that there is a triable issue of fact as to whether Plaintiff engaged in protected activity.

## 2.    Defendant's Knowledge of Protected Activity

Plaintiff must also show that "[t]he named person knew or suspected, actually or constructively, that the employee engaged in the protected activity." *See Van Asdale*, 577 F.3d at 996 (citation omitted). Here, Plaintiff submits that he communicated information about Defendant's misconduct to (1) Lisa Toler, who was Controller and CFO at the time, (2) Klaus Hasbo, CEO, (3) Philip Brown, COO, and (4) Patrick Glenn, Vice President of Operations. These individuals were Plaintiff's supervisors, *see* 18 U.S.C. § 1514A(a)(1)(C), and were the direct recipients of Plaintiff's allegations. There therefore exists, at the very least, a triable issue of fact as to whether Defendant knew Plaintiff was engaged in protected activity. *See Van Asdale*, 577 F.3d at 1002–03 (concluding that the

---

[3] Defendant additionally contends that Plaintiff's answers to a Securities and Exchange Commission ("SEC") questionnaire, in which Plaintiff represented that he did not report these matters to his supervisors, undermine Plaintiff's assertions that he did indeed report what he believed to be fraud. (Reply at 6–7.) But as the Court noted in its previous Order, "the credibility of [Plaintiff's assertions] is an issue of fact[.]" (Doc. 37.)

11

plaintiffs made a sufficient showing as to knowledge where they "engaged in protected activity during the November 24, 2003 meeting with Johnson, as well as with Brown, and Pennington" and that "these persons have 'supervisory authority' over the" plaintiffs); *Wadler*, 916 F.3d at 1188 (reasoning that an employee who has a reasonable belief that certain conduct is unlawful need not "actually communicate[] the reasonableness of [his] beliefs to management or the authorities" (quoting *Sylvester*, 2011 WL 2517148, at *13)).

### 3.    Protected Activity as a Contributing Factor to Termination

The final element of the prima facie case requires a plaintiff to show that "the circumstances were sufficient to raise an inference that the protected activity was a contributing factor in the unfavorable action." *Tides*, 644 F.3d at 814. Here, Plaintiff, who worked as a Production Engineer, was told he was being terminated in December 2023. (Statement of Facts ¶ 40; Brown Decl. ¶ 5.) When Plaintiff was terminated, he had no performance issues. (Ex. B to Bean Decl., Brown Depo. at 6, Doc. 59-2.) Rather, Defendant maintains that Plaintiff was terminated because Defendant "made the business decision to rely more heavily on third-party consultants and independent contractors for the kind of work [Plaintiff] did" and therefore was "eliminating [Plaintiff's] position[.]" (Brown Decl. ¶¶ 4–5.)

But sufficient evidence exists for a reasonable jury to infer that Plaintiff's protected activity was at least a contributing factor to the termination. Plaintiff attests that he engaged in protected activity in March 2023, June 2023, July 2023, and August 2023 by reporting certain conduct to Toler, Glenn, Hasbo, and Brown. Defendant made the decision to terminate Plaintiff in December 2023, only a few months later. Moreover, the individuals to whom Plaintiff reported his concerns were directly involved in his termination: Brown told Plaintiff he was being terminated, and Glenn and Hasbo had input in the decision. (Brown Depo. at 8.) Plaintiff further testified that between August and December 2023, he continued to be a "squeaky wheel" and raised issues with management in a more brash way. (Potyondy Depo. at 19.) This timeline of events leading up to

12

Plaintiff's termination helps to support an inference that his protected activity contributed to his ultimate termination. *See Van Asdale*, 577 F.3d at 1003 ("We have previously held that 'causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.' . . . where the first adverse employment action took place less than three months after an employee's protected activity." (citation omitted)).

Such an inference is strengthened by the evidence Plaintiff has submitted to challenge Defendant's proffered reason for his termination. As noted above, Defendant admits it did not have any performance issues with Plaintiff, and Defendant points to nothing that Plaintiff did to warrant termination. *Cf. Kama v. Mayorkas*, 107 F.4th 1054, 1060–64 (9th Cir. 2024) (affirming summary judgment where there was no genuine dispute that employee had failed to cooperate with his employer's investigation). Rather, Defendant asserts that Plaintiff's position was eliminated as part of a business decision to replace Plaintiff with consultants. However, no other positions were eliminated at that time. In fact, Plaintiff states that he observed one of his coworkers changing the coworker's nameplate to Production Engineer—the same title as Plaintiff's—on December 5, 2023, around one week before Plaintiff was told his position was being eliminated. (Potyondy Decl. ¶ 24.) A jury may question why Defendant's decision to rely on outside consultants impacted only Plaintiff, and did not impact others performing similar roles within the company. A reasonable jury could thus find Defendant's proffered explanation for Plaintiff's termination to be pretextual or weak, and therefore find it unlikely that Plaintiff was terminated for only non-retaliatory reasons.

To be sure, the fact that Defendant did not terminate Plaintiff sooner, and the fact that Defendant allowed Plaintiff to remain employed with access to its databases until January 19, 2024, (*see* Brown Decl. ¶ 5), weigh against a finding that Defendant terminated Plaintiff in retaliation for whistleblowing. But because Plaintiff's termination followed multiple instances of Plaintiff reporting perceived misconduct to those who

13

ultimately decided to terminate Plaintiff, and because Plaintiff's position was the only position eliminated just months after Plaintiff made those reports, an inference that Plaintiff's whistleblowing activity contributed to his termination would be reasonable.

Accordingly, Plaintiff has met its burden at this stage to show that a triable issue of fact exists for each element of the prima facie case.

## B.    Burden-Shifting Analysis

Once the plaintiff proves the prima facie case of his Sarbanes-Oxley claim, the burden shifts to the employer to show by clear and convincing evidence that it would have taken the "same adverse employment action in the absence of the plaintiff's protected activity." *Van Asdale*, 577 F.3d at 996.  Defendant argues in its motion that there is "overwhelming evidence that [Defendant] still would have eliminated his position in the absence of his alleged protected activity," yet does not point to any evidence apart from the evidence it has already offered to attack Plaintiff's prima facie showing of causation. (Mem. at 23; *see* Reply at 15–17.)  For the reasons discussed above, in considering this evidence, a reasonable jury could question whether the elimination of Plaintiff's position was the legitimate reason motivating Plaintiff's termination.  Accordingly, Defendant has not met its burden to show, as a matter of law, Plaintiff would have been terminated due to the elimination of his position even in the absence of protected activity.

For the reasons stated above, Defendant has not shown that Plaintiff's Sarbanes-Oxley Act claim fails a matter of law.  Accordingly, Defendant's motion for summary judgment on Plaintiff's Sarbanes-Oxley claim is DENIED.

## C.    Punitive Damages

The parties agree that punitive damages are not available under the Sarbanes-Oxley Act.  *See* 18 U.S.C. § 1514A(c).  Plaintiff states that he does not oppose summary

14

judgment on this issue.  (Opp. at 29.)  Accordingly, the Court GRANTS Defendant's motion for summary judgment as to punitive damages.

## IV.   **CONCLUSION**

For the above reasons, Defendant's Motion is GRANTED IN PART AND DENIED IN PART.  Summary judgment is GRANTED as to punitive damages under the Sarbanes-Oxley Act.  In all other respects, it is DENIED.

DATED:  April 17, 2026

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

15